**UNITED STATES of America**

v.

**Harold M. YANOWITCH et al., Defendants.**

**No. 76 Cr. 685 (MEF).**

United States District Court,
S. D. New York.

May 19, 1978.

Robert B. Fiske, Jr., U. S. Atty. for the Southern District of New York, New York City, for the United States of America; Jeremy G. Epstein, Asst. U. S. Atty., of counsel.

Ford, Marrin, Esposito, Witmeyer & Bergman, New York City, for defendant, Harold M. Yanowitch; Paul E. Bergman, New York City, of counsel.

### OPINION.

FRANKEL, District Judge.

Sentenced to a year's imprisonment over 14 months ago for crimes of securities and mail fraud and conspiracy, Harold M. Yanowitch, a lawyer for many years, has remained free on bail since then while his conviction was appealed. In the meantime, he has done what most people do: he has

contrived to go on living. Disbarred after his conviction, unemployed for a substantial period, reduced to relative poverty from relative affluence, he arranged for employment in England, being permitted on the Government's consent to go there for this interim period. His marriage has finally collapsed under the strain and he has custody of the youngest of his four children, a teen-age son, said to have been rejected by the mother because of his continued loyalty to defendant.

The 58-year-old defendant confronting these problems appears to be uncertainly equipped to cope with them. Mr. Yanowitch is described in uncontradicted expert appraisals as having a long history of chronic depression for which he has been in fairly regular psychiatric treatment for almost 20 years. His life story includes what are described as at least "two suicidal acts," neither seeming to have verged on "success," but neither evidencing discerned qualities of pretense or fakery. He faces prison now in a state characterized by several psychiatrists as despair and hopelessness. One distinguished psychiatrist reports:

"His depression has been aggravated by his guilty self-reproach and shame for having failed his family and friends (although at the the same time his dependent self-image protects him from a sense of personal responsibility for any wrongdoing done under the influence of others)."

Another psychiatrist—who practices, and has treated defendant only during his recent sojourn, in England—erects upon the last-quoted parenthetical element a stronger observation, perhaps transcending the field of his expertise. He says:

"After intensive interviewing I have come to the conclusion that Mr. Yanowitch had no ill intent whatever in his business dealing. Indeed he is, in my opinion, a man of integrity and high standards who is bedevilled by long standing depression."

There are, in an array of psychiatric submissions, intimations that the incarceration of Mr. Yanowitch may aggravate his suicidal tendencies. Nobody ventures—it is clear nobody can venture—a measurement of this risk. The most impressive of the reports says, however, that "suicidal moves on his part would seem quite possible." Other doctors tender similar opinions. The motion papers are sufficient, in short, to trouble anyone who has not succeeded in shedding all the burdens of humanity. It is not a complete antidote, though it is certainly relevant, that the misfortunes of the defendant that concern the court are—at least legally, as judge and jury saw things—of his own making.

This is in any event the broadly sketched setting in which the court deals with the motion "for an order * * * reducing the defendant's sentence from the previously imposed sentence of one year's imprisonment to a sentence of supervised probation alone * * *." The court, while omitting some details, has summarized at the outset the most moving aspects of the plea so that those who judge the judges, not least the defendant himself, may be disposed to consider that the living individual has not actually been blotted from view in today's decision that Mr. Yanowitch is justly required to serve the sentence heretofore imposed.

The most powerful obstacle to defendant's motion is the cold, calculated, greedy character of the crimes for which he stands convicted. Like too many of our fortunate and relatively affluent business and professional people, Mr. Yanowitch allowed himself to engage in a course of fraud and deceit, using his professional training in the process, only to help himself and his coconspirators amass more than the already sufficient wealth they enjoyed. Without seeming qualms, he worked steadily to subvert the law he had been trained and commissioned to administer. His neurosis, which excludes his crimes from the causes he finds for experiencing "guilt," is not in this aspect the kind of affliction for which a court of law may find ready sympathy.

This court has never deemed sentencing a time for judicial righteousness or the sadist joys of tongue-lashings. The stern descrip-

tion of defendant's guilt is relevant now because desert remains central in punishment and should, if possible, be central in defendant's efforts to assimilate the part of his destiny committed now to fallible human judgments. Fallible or not, the court's judgment in this case concurred unequivocally with the jury's. Not only did Mr. Yanowitch participate in frauds that were major, varied, and long-continued. He was at all times a leader in the conspiracy, receiving on that record one of the two longest sentences, of a year each. The near certainty and the grave extent of defendant's culpability emerged from a long, hotly contested trial, not from prosecutors' untried allegations or newspaper outcries following some innocuous plea bargain. These circumstances weighed heavily in the scale on the day of sentencing. They still do.

Among the sentencing factors in defendant's favor were his theretofore unblemished record, a career of seemingly reputable functioning and service in his community, and the high probability that he would not again run afoul of the law. The court was aware, too, of his probable disbarment, the already evident devastation of his marriage, and his emotional vulnerability.

Without attempting to reconstruct or rehearse again all that was appraised on the day of sentence, the court proceeded then, as always, on the principle that the sentence should be of the least severity commensurate with the goals to be served. The perceived purposes of this particular sentence were to mark the gravity of the offenses and to promote, as we are drawn persistently to hope, a measure of general deterrence. Within the limits of our inadequate data, the court derived an impression of the general run of sentences for roughly comparable offenses, and may have leaned, in our regime of inescapably individualized judicial discretion, toward what was thought to be the lower end of the range. And, of course, the court considered Mr. Yanowitch's level of responsibility as compared with his convicted codefendants, a factor which, as has been noted, placed him at the high end of *that* range.

Though more time has passed than ideally should between the imposition and the execution of the sentence, most of the material conditions remain unchanged. We are told in eloquent motion papers that prison in this case is needed neither for incapacitation nor for "rehabilitation." Far from helping, it is argued, confinement will be generally hurtful to this defendant. And why, after all, is it necessary to inflict so much hurt on one individual in the largely undocumented hope that others will thereby be discouraged from comparable sins? These are all, in their general terms, familiar contentions, but never weightless despite their recurrence. The fact remains they were almost entirely embraced in the reckoning when this defendant was sentenced. Most of us ceased long ago comforting, or hardening, ourselves with the notion that prison is good for people. Our impoverished imaginations leave us still with confinement as the most severe form of punishment precisely because it hurts and despite the fact that we lock up many thousands who would not be dangerous if they were at large. The incessantly troublesome question of using a defendant as a "means" for the purposes of others, i. e., for the deterrence of strangers who may be potential malefactors, remains conventional practice and wisdom notwithstanding Kant's categorical opposition.

There remains the spectre of possible suicide. It is, as has been acknowledged, impossible to "weigh" this with even a brave simulation of confidence. Yet the court is compelled to assign it an order of consequence or there would be no use even pretending to think about this defendant's case. Though any of us on the bench could expect to die at least a little upon learning that a prison sentence had proved, as threatened, to be a death sentence, we are surely forbidden by our oaths to repeal the sanction of imprisonment because someone says "suicide." So the pertinent materials have been read and re-read, not merely the observations about suicide, but the descriptions of the total personality to which they relate. There have been, as noted earlier, what one psychiatrist calls past "suicidal

acts" and another has called "suicidal moves." There is in defendant's accounts of himself a "suicidal preoccupation," and the entry into prison might, in the words of another psychiatrist, enhance "the hazard of a suicidal gesture." Mr. Yanowitch himself, in a letter to counsel preliminary to this proceeding, makes, in passing and without detail, the detached report that during his treatment in England a while ago he was adversely affected by some medication and "went into a further depression and there was a suicide attempt." It seems relevant, if scarcely decisive, that none of these "acts" or "moves" or "attempts" has led thus far to any reported injury of serious dimension. The court hastens to disclaim easy solace or diagnostic insight from that. It remains a datum to be taken into account.

With all his miseries, Mr. Yanowitch has strengths immensely superior to those of most people we imprison. We lock up hosts of men and women who are inadequate, deprived totally and since forever, depressed, addicted, incompetent, stupid, helpless, in emotional states for which "fragile" would say too much, physically ill—displaying little or nothing, in short, on which they or we might build hope for them. Mr. Yanowitch has high intelligence, learning, literacy, clear powers of adaptation, the stored benefits of nurture and good living, evident abilities to care for himself competently and well. Not long after disbarment, he made his way to England; joined a seemingly substantial company; "has," in its Director's words, "been integrated as part of its sales and administrative unit"; has been able already to gain compensation at the rate of $30,000 per year; and has been traveling about the world negotiating and renegotiating arrangements of substantial import for his new employer. There is overwhelming reason to hope and expect that this defendant will have fruitful years of life, for himself and those he cares about, after service of the sentence the court was driven to deem fair in his case.

Considering the whole man, with all his troubles, the court is led not only to hope but to expect that defendant will marshal his forces to survive for that future. There remains the possibility he will wish to kill himself and succeed in doing so. On balance, both he and the court must take that risk. As his able counsel reflects in the motion he has made, the suicide risk is triggered by *any* imprisonment at all. Elimination of the entire prison sentence in this case, considering all those directly involved and the demands of equal justice across a far wider range, seems totally unacceptable. Reduction of the sentence is neither highly responsive to the claim of need nor, again, reconcilable with the insistent demands of fairness to all.

The motion to reduce the sentence is denied. So ordered.